IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Madeline Mendoza, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *-vs-* | ) | No. _____ |
| | ) | |
| City of Chicago, Reynaldo Gue- | ) | *(jury demand)* |
| vara, Joann Halvorsen as Special | ) | |
| Representative for Ernest Hal- | ) | |
| vorsen, Stephen Gawrys, and An- | ) | |
| thony Riccio, | ) | |
| | ) | |
| *Defendants.* | ) | |

## COMPLAINT

Plaintiff, by counsel, alleges as follows:

1. This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343 and 1367.

2. When she was just 16 years old, plaintiff Madeline Mendoza was framed for murder by notorious Chicago police detectives Reynaldo Guevara and Ernest Halvorsen.

3. Mendoza served more than seventeen years of wrongful imprisonment, an injury from which she continues to suffer.

4. The Chicago Police Department's official policies and customs of failing to discipline, supervise, and control its officers, as well as its code of silence, caused the misconduct of Guevara and Halvorsen.

5.  Based on the powerful evidence that has come to light about Guevara and Halvorsen's repeated wrongdoing and evidence of plaintiff's innocence, the Circuit Court of Cook County vacated plaintiff's conviction.

6.  Plaintiff brings this lawsuit to secure a remedy for the grievous harms she suffered from her wrongful imprisonment.

## I.  Parties

7.  Plaintiff Madeline Mendoza is a resident of the Northern District of Illinois.

8.  Defendant City of Chicago is an Illinois municipal corporation.

9.  Defendants Reynaldo Guevara, Stephen Gawrys, and Anthony Riccio were, at all relevant times, acting under color of their offices as Chicago police officers. Plaintiff sues these defendants in their individual capacities only.

10. Defendant JoAnn Halvorsen is sued in her capacity as Special Representative of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Ernest Halvorsen.

11. Ernest Halvorsen was, at all relevant times, acting under color of his office as a Chicago police officer.

12. Plaintiff refers to Ernest Halvorsen, Reynaldo Guevara, Stephen Gawrys, and Anthony Riccio as the "individual officer defendants."

## II.    False Arrest and Unreasonable Prosecution of Plaintiff

13.  On May 12, 1992, Jacqueline Montanez shot and killed Jimmy Cruz and Hector Reyes in Humboldt Park on the West Side of Chicago.

14.  At the time of the killings, plaintiff was with Montanez, Cruz, Reyes, and another woman, Marilyn Mulero.

15.  Plaintiff did not have any prior knowledge of any plan to kill Cruz or Reyes and she did not in any way aid, abet, facilitate, or participate in the homicides.

16.  Defendants Guevara and Halvorsen were assigned to investigate the murders.

17.  Defendants Guevara and Halvorsen conspired, confederated, and agreed to fabricate a false story that plaintiff had participated in the murders.

18.  Defendants Guevara and Halvorsen concocted the false story that Montanez shot Reyes, she then gave the gun to Mulero, and then Mulero shot Cruz after plaintiff signaled Mulero to shoot.

19.  The acts of Guevara and Halvorsen in furtherance of their scheme to frame plaintiff include the following:

        a.  They caused Montanez to make a statement falsely implicating plaintiff in the murders;

b. They caused Mulero to make a statement falsely implicating plaintiff in the murders;

c. They caused Yvette Rodrigues to provide a false statement that she had heard plaintiff, Montanez, and Mulero each bragging about the shootings;

d. They caused Jackie Serrano to provide a false statement that she had witnessed plaintiff participate in the shooting of Cruz from her apartment; and

e. They caused Joan Roberts, a jailhouse informant, to provide a false statement that plaintiff had admitted to participating in the murders.

20. The acts of Guevara and Halvorsen in furtherance of their scheme to frame plaintiff also include the following:

a. They prepared police reports containing the false story;

b. They attested to the false story through the official police reports; and

c. They communicated the false story to prosecutors.

21. Defendants Gawrys and Riccio either participated in the above-described acts or knew of them and failed to intervene to prevent the violation of plaintiff's rights.

22. The individual officer defendants committed the above-described wrongful acts knowing that the acts would cause plaintiff to be held in custody and wrongly prosecuted.

23. Plaintiff was charged with murder because of the wrongful acts of the individual officer defendants.

24. Plaintiff knew that it would be impossible to prove that the individual officers had concocted the evidence against her.

25. Accordingly, even though plaintiff was innocent, she pleaded guilty to the murder of Cruz and to conspiracy to commit the murder of Reyes on September 22, 1993, and she was sentenced to 35 years for murder concurrent to 7 years for conspiracy.

26. Plaintiff served her sentence and was released from prison in 2009.

27. Plaintiff was deprived of liberty because of the above-described wrongful acts of the individual officer defendants.

### III.    Plaintiff's Exoneration

28. Plaintiff challenged the above-described wrongful conviction after learning that lawyers for other wrongfully convicted individuals had discovered repeated misconduct by Guevara and Halvorsen.

29. On January 3, 2023, the Circuit Court of Cook County vacated plaintiff's convictions and granted the State's request to *nolle prosequi* the case.

### IV. Official Policies and Customs of the Chicago Police Department Were the Moving Force for Defendants' Misconduct

30. At all relevant times, the Chicago Police Department maintained official policies and customs that facilitated, encouraged, and condoned the misconduct of the individual officer defendants.

### A. Failure to Discipline

31. At all relevant times, the Chicago Police Department maintained a policy or custom of failing to discipline, supervise, and control its officers. By maintaining this policy or custom, the City caused its officers to believe that they could engage in misconduct with impunity because their actions would never be thoroughly scrutinized.

32. Before plaintiff's arrest, policymakers for the City of Chicago knew that the Chicago Police Department's policies or customs for disciplining, supervising, and controlling its officers were inadequate and caused police misconduct.

33. Despite their knowledge of the City's failed policies and customs for disciplining, supervising, and controlling its officers, the policymakers failed to take action to remedy these problems.

34. As a direct and proximate result of the Chicago Police Department's inadequate policies or customs for disciplining, supervising, and controlling its officers and the policymakers' failure to address these problems,

the individual officer defendants engaged in misconduct, including but not limited to the wrongful arrest, detention, and prosecution of plaintiff, as described above.

### B. Code of Silence

35.  At all relevant times, the Chicago Police Department maintained a "code of silence" that required police officers to remain silent about police misconduct. An officer who violated the code of silence would be penalized by the Department.

36.  At all relevant times, police officers were trained at the Chicago Police Academy not to break the code of silence. Officers were instructed that "Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

37.  This "code of silence" facilitated, encouraged, and enabled the individual officer defendants to engage in egregious misconduct for many years, knowing that their fellow officers would cover for them and help conceal their widespread wrongdoing.

38. In the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that, as of February 2007, "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

39. In December 2015, Chicago Mayor Rahm Emanuel acknowledged the continued existence of the code of silence within the Chicago Police Department; Emanuel, speaking in his capacity as Mayor, admitted that the code of silence leads to a culture where extreme acts of abuse are tolerated.

40. In April 2016, the City's Police Accountability Task Force found that the code of silence "is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

41. In an official government report issued in January 2017, the United States Department of Justice found that "a code of silence exists, and officers and community members know it."

42. On March 29, 2019, then-Chicago Police Superintendent Eddie Johnson publicly acknowledged the code of silence, stating that some Chicago police officers "look the other way" when they observe misconduct by other Chicago police officers.

43. In October 2020, then-Chicago Police Superintendent David Brown acknowledged in public comments that the "code of silence" continues to exist.

44. The same code of silence in place during the time period at issue in the *Obrycka* case and recognized by the Mayor, Superintendent Johnson, Superintendent Brown, the Task Force, and the Department of Justice was also in place when plaintiff suffered the wrongful arrest, detention, and prosecution described above.

45. As a direct and proximate result of the City's code of silence, the individual officer defendants engaged in misconduct, including but not limited to the wrongful arrest, detention, and prosecution of plaintiff, as described above.

## C. The City's Policies and Customs Have Caused Numerous Other Wrongful Convictions

46. Chicago Police Officers, including the individual officer defendants, acting pursuant to defendant City of Chicago's "code of silence" and defective discipline policy have concocted false stories and fabricated evidence in numerous other cases.

47. In each case, the officers concocted false stories and fabricated evidence because they knew that there would be no consequences for their

misconduct because of defendant City of Chicago's "code of silence" and defective discipline policy.

48. These numerous cases include, but are not limited to, the following:

  a. In August of 1988, defendant Guevara caused Jacques Rivera to be falsely convicted of murder by coercing a witness to falsely identify Rivera;

  b. In September of 1989, defendant Guevara caused Juan Johnson to be falsely convicted of murder by coercing a witness to falsely identify Johnson;

  c. In August of 1990, defendant Guevara caused Jose Maysonet to be falsely convicted of murder by coercing him into falsely confessing;

  d. In January of 1991, defendant Guevara caused Xavier Arcos to be falsely convicted of murder by coercing a witness to falsely identify Arcos;

  e. In May of 1993, defendants Guevara and Halvorsen caused Armando Serrano and Jose Montanez to be falsely convicted of murder by coercing a witness to falsely testify that Serrano and Montanez admitted to committing the murder;

f.  In May of 1993, defendants Guevara and Halvorsen caused Robert Bouto to be falsely convicted of murder by coercing two jailhouse informants to falsely testify that Bouto admitted to committing the murder;

g.  In June of 1993, defendant Guevara caused Gabriel Iglesias to be falsely convicted of murder by coercing two witnesses to falsely identify Iglesias and by coercing a jailhouse informant to falsely testify that Iglesias admitted to committing the murder;

h.  In September of 1994, defendant Guevara caused Roberto Almodovar and William Negron to be falsely convicted of murder by coercing a witness to falsely identify Almodovar and Negron;

i.  In May of 1995, defendants Guevara and Halvorsen caused Thomas Sierra to be falsely convicted of murder by coercing false testimony from two witnesses; and

j.  In April of 1998, defendant Guevara caused Gabriel Solache and Arturo Reyes to be falsely convicted of murder and kidnapping by coercing them to give false confessions.

## V. Claims

49. As a result of the foregoing, defendants caused plaintiff to be deprived of rights secured by the Fourth and Fourteenth Amendments.

50. As a supplemental state law claim against defendant City of Chicago only: as a result of the foregoing, plaintiff was subjected to a malicious prosecution under Illinois law.

51. Plaintiff hereby demands trial by jury.

WHEREFORE plaintiff requests that appropriate compensatory damages be awarded against defendants, that appropriate punitive damages be awarded against all defendants against whom punitive damages may be awarded, and that the Court award fees and costs against defendants.

/s/  <u>Joel A. Flaxman</u>
      Joel A. Flaxman
      ARDC No. 6292818
      Kenneth N. Flaxman
      Collin J. Gill
      KENNETH N. FLAXMAN P.C.
      200 S Michigan Ave, Ste 201
      Chicago, IL 60604
      (312) 427-3200
      jaf@kenlaw.com
      *attorneys for plaintiff*