UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MADELINE MENDOZA, | ) | |
| | ) | No. 23 CV 2441 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MARILYN MULERO, | ) | |
| | ) | No. 23 CV 4795 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | June 11, 2026 |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

Plaintiffs Madeline Mendoza and Marilyn Mulero bring this action against

Defendants City of Chicago ("City"), Reynaldo Guevara, Geri Lynn Yanow (as

Special Representative for Decedent Ernest Halvorsen), Anthony Riccio, Stephen

Gawrys, and Robert Biebel (collectively, the "Individual Defendants") for causing

their wrongful convictions for the May 1992 murders of Jimmy Cruz and Hector

Reyes. Before the court are the City's objections to Plaintiffs' *Monell* discovery

requests. For the following reasons, the objections are sustained in part and

overruled in part:

## Background

Having completed fact discovery on non-*Monell* claims, Plaintiffs propose proceeding with *Monell* discovery and serving a set of Interrogatories, Requests for Production of Documents ("RFPs"), and Rule 30(b)(6) topics on the City. (See R. 122.) As directed, the City posed their objections thereto in May 2025. (R. 133; R. 134; R. 135.) The court then held a hearing in July 2025 during which Plaintiffs explained that they are not aware of any specific written policies or directives Individual Defendants followed when violating their constitutional rights. (R. 151, July 16, 2025 Hr'g Tr. at 4-5.) However, Plaintiffs allege that several City-sanctioned, widespread practices led to the violations of their constitutional rights. (Id. at 5-6, 16, 34.)

Plaintiffs seek extensive information and documents from the City, but the core of their *Monell* claim targets ranking Chicago Police Department ("CPD") officials, specifically those in Area 5, (id. at 53), for allowing the alleged unconstitutional police practices to continue unabated. Plaintiffs allege that Area 5 ranking CPD officials were aware of their Detectives' brazen and unlawful tactics, including the practices of coercing confessions and fabricating witness testimony. Nevertheless, these officials fostered such tactics, creating a *de facto* policy that systematically ignored the constitutional rights of the arrested and accused. Based on this theory, whether CPD officials had notice of its Detectives' alleged misconduct—specifically, coercing confessions and fabricating evidence—and what

2

if any actions they took in response are the threshold factual issues underlying Plaintiffs' *Monell* claim.

## Analysis

Plaintiffs bring a claim against the City under 42 U.S.C. § 1983 for alleged constitutional violations its Detectives, namely Reynaldo Guevara and Ernest Halvorsen, allegedly committed. Claims against a municipality under Section 1983 are referred to as "*Monell* claims," after *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Because Plaintiffs' *Monell* claims may drastically expand the scope, duration, and cost of discovery, some background on the purpose and proper scope of *Monell* claims is warranted here.

*Monell* evolved from the Supreme Court's decision in *Monroe v. Pape,* 365 U.S. 167, 191-92 (1961), which held that individuals could sue government officials who violate their constitutional rights under Section 1983 but not municipalities because Congress did not intend for local governments to be subjected to Section 1983 liability when it enacted the statute in 1871. *Monell* backtracked on the latter part of the *Monroe* decision and held that Section 1983 claims may be filed against municipalities under limited circumstances—specifically, where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 663 n.7, 694. But the Court reserved judgment on "the full contours of municipal liability under § 1983 may be" and "expressly le[ft] further development" of these claims for "another day." *Id.* at 695.

3

A "highly complex body of interpretive law" on when plaintiffs can establish a municipal policy or custom developed in the wake of *Monell*. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 430 (1997) (Breyer, J., dissenting). Ultimately, a plaintiff may prove *Monell* liability by demonstrating that: (1) the municipality had a written unconstitutional policy, *Monell,* 436 U.S. at 660-62, 682, 694-95; (2) a widespread pattern of unconstitutional behavior exists that functions as a state-enforced custom, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970); (3) a municipality acted with deliberate indifference to unconstitutional actions and at the direction of a "final policymaker," *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 474, 483-84 (1986); or (4) the municipality failed to properly screen, hire, train, or supervise its employees, *see City of Canton v. Harris*, 489 U.S. 378, 380 (1989); *Brown*, 520 U.S at 411; *Connick v. Thompson*, 563 U.S. 51, 61 (2011). But individual actions—like an unjustified yet isolated incident where a city's police officer shoots a citizen—cannot result from official policy or give rise to municipal liability. *See, e.g.*, *City of Okla. City v. Tuttle*, 471 U.S. 808, 821 (1985).

Plaintiffs' success rate prosecuting *Monell* claims is generally low. *See* Joanna C. Schwartz, *Municipal Immunity*, 109 Va. L. Rev. 1181, 1207-13 (2023) ("Schwartz"). Schwartz points out that:

> it is more difficult to prevail on *Monell* claims against local governments than on Section 1983 claims brought against individual officers. Of the 955 cases in the dataset in which *Monell* claims were pled and could be challenged, 30.2% of the *Monell* claims were dismissed at the motion to dismiss and summary judgment stages, whereas 19.9% of the 955 cases were dismissed in their entirety at these stages. A total of 614 (64.3%) cases settled, but only 491 (51.4%) *Monell* claims were settled or voluntarily dismissed.

4

*Id.* Critics say this is because the standards are impracticably difficult to satisfy. *See* David Jacks Achtenberg, *Taking History Seriously: Municipal Liability Under 42 U.S.C. § 1983 and the Debate over Respondeat Superior*, 73 Fordham L. Rev. 2183, 2191 (2005) ("[T]he standard for awarding compensatory damages against cities under § 1983 is even higher than the standard for awarding punitive damages against private employers.").

Despite the uphill battle and expense—often with little to no monetary value because local governments indemnify 99.98% of the judgments entered against law enforcement officers in police misconduct cases, Schwartz at 1189, or without demanding injunctive relief—plaintiffs in Section 1983 cases routinely bring *Monell* claims. To be sure, there are strategic benefits to pursuing them. Successful *Monell* claims can "provide[] a path to recover[]" compensatory damages "for plaintiffs stymied by the doctrine of qualified immunity." Matthew J. Cron, *Municipal Liability: Strategies, Critiques, and a Pathway Toward Effective Enforcement of Civil Rights*, 91 Denver L. Rev. 583, 606 (2014) ("Cron"). And in the rare event that a municipality refuses to indemnify a defendant officer, a *Monell* judgment may be the plaintiff's only opportunity to recover money damages. Schwartz at 1189.

There are also non-financial reasons for bringing *Monell* claims. A *Monell* claim "permits wider discovery, broadens the scope of admissibility at trial, facilitates holding supervisory and command officials responsible, and allows plaintiffs' litigators to properly apportion the blame between the individual officers

5

and the municipality." G.F. Taylor, *A Litigator's View of Discovery and Proof in Police Misconduct Policy and Practice Cases*, 48 DePaul L. Rev. 747, 749 (1999) ("Taylor"). *Monell* discovery can "also facilitate the development of systemic evidence of deliberate indifference to police brutality," expose evidence "concerning 'repeater' officers," and reveal how the "police disciplinary and counseling system" functions. *Id*. at 748. Moreover, "aggressive discovery and litigation" of these claims can impact public sentiment and lead to systemic change of police policies and practices while "increas[ing] the value of the case for settlement or at trial." *Id*. at 749. Plaintiffs stated as much during the hearing in this case—they hope the jury will hold the City accountable for their unlawful practice as it existed in 1992. (R. 151, July 16, 2025 Hr'g Tr. at 18.) Although the court questions the practical value of such a judgment, it will not presume that the requested relief offers zero benefit to Plaintiffs.

That said, these claims are costly for both the government and plaintiffs. The government's burden of aggregating and producing broader *Monell* discovery is self-evident, especially in cases like this one where the discovery sought includes reports and documents going back to the 1980s. Such discovery often must be recovered, scanned, and electronically indexed before being assessed for relevance and eventually produced, if at all. And while *Monell* claims across different cases may share common threads and discovery from other cases can sometimes be reproduced—as the City has offered to do in the context of Rule 30(b)(6) depositions here—there must be sufficient overlap to reduce the burden on the government.

6

*Monell* claims also burden plaintiffs by "greatly increas[ing] the cost[] of litigation, the attorney time expended, [and] the effort of the opposition." Taylor at 749. Extensive *Monell* discovery and litigation may result in unnecessary delay getting to trial and, if unsuccessful in response to a motion for summary judgment or at trial, plaintiffs cannot recover attorneys' fees incurred and must reimburse the municipality for taxable costs under 28 U.S.C. § 1920. Indeed, even members of the plaintiffs' bar acknowledge that plaintiffs are "best served" by "craft[ing] narrow discovery requests targeted at the specific type of municipal liability claim." Cron at 600. Where a plaintiff serves overbroad *Monell* discovery requests, courts have discretion to limit the scope of discovery to that which is relevant and proportional to the needs of the case. *See Crawford-El v. Britton*, 523 U.S. 574, 598, (1998) ("Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly."). As such, this court must weigh the benefit to be gained from *Monell* discovery sought where there is no dispute over indemnification or qualified immunity against the cost and delay of producing such discovery. *See* Fed. R. Civ. P. 26(b)(1).

Plaintiffs here allege that CPD had "official policies and customs that facilitated, encouraged, and condoned the misconduct" of Individual Defendants, including failing to discipline, supervise, and control its officers and maintaining a department-wide "code of silence" around misconduct. (See R. 26, Mendoza Am. Compl. ¶¶ 30-45.) Plaintiffs thus seek discovery on any "widespread practice" within CPD that "high-ranking officials knew about [where detectives] coerc[ed] confessions . . . and false witness statements." (R. 151, July 16, 2025 Hr'g Tr. at 4-5;

see also R. 108, Jt. Status Rep. at 2 (noting Plaintiffs allege CPD policies included: "(a) coercing confessions; (b) procuring false witness statements from detainees and jailhouse informants; (c) concealing exculpatory evidence; (d) manipulating witnesses to obtain false identifications from suspects and witnesses; (e) manipulating witnesses to influence their testimony; and (f) using these tactics to secure the arrest, prosecution, and conviction of people without regard to their actual guilt or innocence").)  Plaintiffs further allege ranking CPD officials "either ignored" or "did not discipline" Detectives who engaged in this practice such that it amounted to a "*de facto* policy."  (R. 151, July 16, 2025 Hr'g Tr. at 5-6.)

Plaintiffs also claim CPD has policies of "[c]oerc[ing] confessions, fabricat[ing] witness statements, and [] fabricat[ing] jailhouse informant statements" based on its failure to properly train its officers.  (Id. at 8, 10, 47-49.)  For example, Plaintiffs say sufficient training would be to "tell [CPD detectives] to be on guard" against police behavior that may coerce testimony from a witness or suspect, but that training was not given and was "never changed despite higher-ups having notice about misconduct" caused by the insufficient training.  (Id. at 10-11.)  The court notes, however, that Plaintiffs do not show how deficient training caused their convictions.  Their theory is that Individual Defendants fabricated incriminating testimony from various individuals.

Plaintiffs suggest that discovery into these issues is especially necessary where, as here, Individual Defendants have stated that they may raise a qualified immunity defense.  (R. 60, Guevara Ans. at 14, R. 64, Halvorsen Ans. at 13; see also

R. 151, July 16, 2025 Hr'g Tr. at 18 (Guevara noting he is "certainly not abandoning a qualified immunity defense").) But as the court noted, if the conduct alleged occurred—deliberate fabrication of evidence—"there cannot be qualified immunity." (R. 151, July 16, 2025 Hr'g Tr. at 20.) As such, Individual Defendants cannot escape liability based on a qualified immunity defense if Plaintiff's theory of the case is indeed true. Defendants do not dispute this point. Plaintiffs also argue that their *Monell* claim is not for naught even if the City indemnifies Individual Defendants because of the "public benefit of holding the [C]ity accountable for their wrongdoing." (Id. at 18.) But such findings speak to what took place as of 1992— more than three decades ago. Plaintiffs need to consider the level of tangible "public benefit" their *Monell* claim truly confers.

Plaintiffs say their discovery requests are narrowly tailored to seek only "discovery in the specific cases" they identified as involving the same policy they allege here. (Id. at 21-22.) Defendants, on the other hand, emphasize the difficulty not only in the logistics of producing the discovery sought, (see, e.g., id. at 37, 40-42), but also in determining exactly what Plaintiffs seek, given the nebulous nature of the policies they allege, (see id. at 34-36). Based on the complexity of the *Monell* discovery sought and the slight benefit to be drawn from such discovery, the court limits the scope of Plaintiffs' discovery requests as set forth below to ensure there is at least some nexus between *Monell* discovery requested and their theory of *Monell* liability.

**A.     Interrogatories**

Plaintiffs propose serving 15 interrogatories—all of which City objects to as overly broad.  (See R. 133.)  Based on the discussion held during the July 16, 2025 hearing, this court finds that information relevant and proportional to the needs of the case must relate to CPD's notice as to any wrongdoing in which Area 5 Detectives were engaging and ranking Area 5 officials' response thereto, if any. Accordingly, information regarding officer training on various subjects (Nos. 1-6) and written orders, standards, or policies regarding the same subjects (Nos. 7-12) are not relevant to Plaintiffs' *Monell* theory and certainly not proportional to the needs of this case.  The training CPD provided to all officers and written orders, policies, and procedures on interrogating witnesses will not be helpful to the prosecution of *Monell* claims unless ranking Area 5 officials were aware of egregious deviation therefrom or absence of necessary training.  Merely asking a witness whether Individual Defendants violated their training and any policies then existing in 1992—which is what Plaintiffs seek to do with the information—is not relevant or proportional because Plaintiffs allege that Area 5 officials permitted the widespread practice during that period, leading to violations of their constitutional violations.

However, the court finds that Plaintiffs do seek information that may be relevant and proportional to the needs of this case in Interrogatory Nos. 13-15.  The relevant portions state as follows:

10

13. State the approximate date that the CPD and/or City of Chicago became aware of the nature of the allegations raised by the plaintiffs in the below identified cases:

14. State whether any CPD officers were investigated by CPD, the City of Chicago, or any related entities, in connection with the allegations raised by the plaintiffs in the cases identified below. If the answer is in the affirmative, identify any Documents or materials related to any such investigation.

15. State whether any CPD officers were disciplined by CPD, the City of Chicago, or any related entities, in connection with the allegations raised by the plaintiffs in the cases identified below. If the answer is in the affirmative, describe the nature of the discipline.

(R. 133, City's Obj. at 15, 18, 20.) These interrogatories also include a list of 47 civil cases and 2 criminal cases. The City objects to many of the terms Plaintiffs use in these interrogatories. For example, the City says the following terms are too vague: "CPD and/or City of Chicago," "aware," "allegations," "any other entities," "investigated," and "disciplined." (Id. at 17, 19, 22.) The City also objects that the scope of these interrogatories is overly broad because nearly half of the cases Plaintiffs identified concern criminal investigations occurring after 1992.

The court sustains the City's scope objection in part. The theory of liability here is discrete in that Plaintiffs allege the City—more specifically Area 5 ranking officials—allowed and fostered the widespread practice of their Detectives coercing witnesses and arrestees to offer up false testimony with a singular purpose of charging and convicting innocent individuals. As such, this court narrows the scope of the interrogatories to Area 5, complaints related to coercing and fabricating false testimony, and actions Area 5 ranking management officials took once becoming aware of such complaints and practice.

11

The court overrules the objection that the City should not be obligated to produce information regarding those cases where the criminal investigations began after 1992. Information related to post-1992 investigations may be relevant in understanding what if any actions Area 5 took after 1992—which may explain the actions Area 5 could have taken in response to similar pre-1992 complaints—and may serve as corroborating evidence of Area 5's indifference to complaints of coercion and false testimony if ranking management officials failed to take any action in response to complaints of wrongdoing. Accordingly, the City is ordered to answer the following interrogatories as amended as they relate to the 49 cases Plaintiffs identified:

13. State the approximate date that Area 5 management officials (those above Detective level, such as Sergeants, Lieutenants, and Area Commander) became aware of complaints (including federal civil lawsuits), if any, of coercion and intimidation to secure false testimony from witnesses and arrestees.

14. Of the complaints Area 5 management officials became aware of, state whether they caused the investigation of any Area 5 Detectives and, if so, explain the nature of the action they took, the approximate date of such actions, and documents their action would have generated. The City must also explain whether Area 5 management officials took any remedial actions in response to complaints they became aware of, whether sustained or not, including additional and/or new training or issuance of area-wide warnings or directives.

15. State whether the City or Area 5 management officials disciplined any Detectives as a result of any investigation, and if so, identify the names of the officers, date of discipline, disciplinary action taken, and the reasons for such action.

These interrogatories as amended seek relevant information that is proportional to the needs of the *Monell* claim Plaintiffs allege in this action. If the City does not have responsive information, it must answer, "None."

**B.      Requests for Production of Documents**

Plaintiffs propose serving 16 RFPs in connection with their *Monell* claim. Considering the above analysis and the City's objections to the RFPs, the court orders the City to produce the documents specified herein in response to RFP Nos. 1, 2, 15, and 16:

| No. | Ruling |
|---|---|
| 1 | Many of the documents are not relevant to the primary inquiry into whether those with the authority to take remedial action were aware of alleged misconduct—specifically, fabricating evidence by coercing witnesses, detainees, and arrestees to give false testimony—and what they did or failed to do in response. As such, of the 49 cases Plaintiffs identified involving Detectives from Area 5, the City is ordered to produce the certificates of innocence and the deposition transcripts of the City's Rule 30(b)(6) designees and any Area 5 management individuals (e.g., Sergeants, Lieutenants, and Area Commanders), if any. |
| 2 | The City is ordered to produce those reports generated through any investigation into Area 5 Detectives named in the 49 cases Plaintiffs identified for their alleged misconduct—specifically, fabricating evidence through coerced testimony from witnesses, detainees, and arrestees. The City is also ordered to produce documents reflecting the reasons for identifying Guevara for the City's Behavioral Intervention Program, his participation and requirements during the program, the basis for removing him from the program, and all dates in which he was placed into and removed from the program. |
| 3-14 | The court finds that these RFPs do not seek documents that are proportional to the needs of this case. |
| 15 & 16 | The City is ordered to produce reports it prepared, caused to be prepared, or received since 1988, investigating, examining, and/or suggesting remedial measures regarding complaints of official misconduct that include claims of evidence fabrication lodged against Area 5 Detectives, Reynaldo Guevara, Ernest Halvorsen, Stephen Gawrys, and Anthony Riccio. The scope of this ruling is not limited to |

| | |
|---|---|
| | murder investigations. The City is also ordered to produce communications distributed to Area Commanders (not limited to Area 5) from 1988 to the present highlighting the need to ensure that their Detectives are/were not employing intimidation or coercive tactics resulting in false testimony and/or false witness identifications. |

## C.  Rule 30(b)(6) Topics

Plaintiffs propose deposing the City on 8 topics, some including several subtopics, in connection with their *Monell* claim.  Considering the above analysis and the City's objections to the topics, the court orders the City to produce a designee or designees to answer questions on Topic Nos. 1-8 as specified below:

| No. | Ruling |
|---|---|
| 1 & 6 | The City is ordered to designate previous Rule 30(b)(6) testimony—to the extent it has proposed doing so, (R. 135 at 3, 7), as the City's testimony in this case.  The City is also ordered to prepare a designee to answer questions concerning: (a) the practice and policy regarding coercing and/or securing false testimony from witnesses, detainees, and arrestees during the period of 1988 to 1992, if there was any; (b) the practice and policy of considering the number of arrests and/or convictions for purposes of promotions, awards, and/or Detective compensation and the same for management officials above Detective rank; and (c) any remedial measures, changes, and/or specialized training Area 5 implemented since 1988 to present to address any claims and complaints about its Detectives fabricating evidence and coercing false testimony and how Area 5 implemented them. |
| 2-5 & 7 | The City is ordered to designate previous Rule 30(b)(6) testimony—to the extent it has proposed doing so, (R. 135 at 4-8), as the City's testimony in this case in response to these Topics.  The City is not required to do anything further. |
| 8 | The City is ordered to designate previous Rule 30(b)(6) testimony—to the extent it has proposed doing so, (R. 135 at 8), as the City's testimony in this case in response to this Topic.  The City must also, as noted in its objection, produce a designee to cover this Topic as it pertains to Halvorsen, Gawrys, and Riccio. |

14

## Conclusion

For the foregoing reasons, the City's objections to Plaintiffs' *Monell* discovery requests are sustained in part and overruled in part as specified herein. The City is ordered to respond to Interrogatory Nos. 13-15, RFP Nos. 1, 2, 15, and 16, and Rule 30(b)(6) Topic Nos. 1-8 as ordered.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**

15